UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GABRIEL L. JORDAN,

        Plaintiff,

    v.

J. ESPINOZA, et al.,

        Defendants.

Case No.  14-cv-02113-YGR (PR)

**ORDER DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT;
GRANTING IN PART AND DENYING IN
PART PLAINTIFF'S PENDING MOTION;
DIRECTING DEFENDANT TO FILE
DOCUMENT UNDER SEAL; REFERRING
MATTER FOR SETTLEMENT
PROCEEDINGS; AND SETTING CASE
MANAGEMENT CONFERENCE**

## INTRODUCTION

In this *pro se* civil rights action under 42 U.S.C. § 1983, Plaintiff Gabriel L. Jordan complains that he was subjected to unconstitutionally excessive force by officers from the San Francisco Police Department ("SFPD") and California Highway Patrol ("CHP") in the course of his arrest on May 24, 2012 after he and his brother led police on a high speed pursuit in a stolen van.[1]  The operative complaint is his amended complaint, in which he names the following Defendants from the San Francisco Police Department:  Lt. Scott F. Ryan[2]; Sergeants Joshua Espinoza, Thomas J. Maguire, Matthew T. Mason, Stephen D. Jonas, Ronald T. Liberta, and Joshua D. Hinds; and Officers Yaroslav V. Shablinskiy, Marvin N. Cabuntala, Rolly G. Junio, John P. Cunnie, and Victor Hui.[3]  Dkt. 9 at 2.  Plaintiff seeks monetary damages.  Before the Court is Defendants' motion for summary judgment.  Dkt. 59.  Plaintiff filed his opposition, and Defendants filed their reply.  Also pending before the Court is Plaintiff's "Motion For Judicial Assistance to Subpoena Discovery Documents."  Dkt. 67.  For the reasons discussed below, the

---

[1] Plaintiff later pleaded guilty to robbery under California Penal Code § 211.  Oldfather Decl., Ex. I (Plea. Hrng. Transcript) at 4:7-11:8.  His brother pleaded guilty to related charges.  *Id.*

[2] Defendant Ryan was a Sergeant at the time of the incident in 2012.  Ryan Decl. ¶ 2.

[3] All claims against the six unnamed CHP Officers on his amended complaint were dismissed because the use of Doe Defendants is not favored in the Ninth Circuit.  Dkt. 14 at 3.  To date, Plaintiff has not moved to identify them or to add them as named defendants.

United States District Court
Northern District of California

Court DENIES both Defendants' motion for summary judgment and Plaintiff's pending motion.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.   FACTUAL BACKGROUND

#### A.   Plaintiff's Version

In his verified amended complaint, Plaintiff alleges that he was subjected to excessive force during the course of his May 24, 2012 arrest by the aforementioned Defendants. Specifically, Plaintiff alleges that he was pulled over around 11:00 pm on May 24, 2012, and was told to "lay face down in a surrendering position with [his] arms and legs spread apart." Dkt. 9 at 3. Plaintiff claims that he complied and that "about 6 CHP Officers surrounded [his] right side and the 12 SFPD Officers surrounded [his] left side." *Id.* Plaintiff claims that as he "lay[] there motionless," one of the officers shouted, "Stop resisting!" *Id.* One of the CHP officers hit Plaintiff in the back of his head with a shotgun, the other SFPD officers held him down by standing on his hands and arms, and two other officers held him by his legs while "other officers kicked, punched, and slammed [his] head into the ground." *Id.* Plaintiff claims that he "went in and out of consciousness twice" and suffered a "seizure for the first time in [his] life." *Id.* He adds that the beating did not stop "until [his] heart and breathing stopped from the abuse." *Id.* Paramedics had to revive Plaintiff afterwards, and they took him to the hospital. *Id.* Plaintiff claims that Defendants' actions caused him to sustain injuries, including "numerous seizures, migraines, [and] back, right hip, right knee [and] right ankle pains." *Id.* Plaintiff also claims that he has a permanent limp and that he has to walk with a cane. *Id.*

#### B.   Defendants' Version

##### 1.   The Car Pursuit

On May 24, 2012, Plaintiff was chased at high speed by SFPD officers for being a suspect in an armed robbery and for driving the vehicle that was stolen at gunpoint. Junio Decl. ¶¶ 2, 6.

Defendant Junio was on duty in his marked police car, patrolling the SOMA/Embarcadero Area of San Francisco when he heard dispatch: "Elderly woman was forced out of her vehicle by force . . . . A[t] 211 Washington Street/Battery Street . . . 1990 Ford Van With Idaho Plates . . . Subjects did have a gun . . . they broke her window to get the keys from her." *Id.* ¶ 2; Oldfather

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Decl., Ex. E (Computer Aided Dispatch ["CAD"]) at 1.

2         Defendant Junio drove west on Harrison Street and stopped his patrol car facing the

3    onramp for Highway 80 and the Bay Bridge.  Junio Decl. ¶ 3.  After about five minutes,

4    Defendant Junio noticed a vehicle in his rear view mirror turning onto Harrison Street.  *Id.* ¶ 4.

5    The vehicle was headed west, towards Defendant Junio, but it was on the wrong side of the road,

6    driving into oncoming traffic.  *Id.* ¶ 5.  Defendant Junio watched as the vehicle, which was a white

7    van, veered back into its proper lane of travel and kept approaching.  *Id.*  As the van passed him,

8    Defendant Junio "looked at the passenger[4] and saw who [he] would identify at the preliminary

9    hearing as [Plaintiff]."  *Id.* ¶ 6 (brackets and footnote added); Oldfather Decl., Ex. H (Prelim.

10   Hrng. Transcript) at 85:24-86:7.  When Defendant Junio saw the rear Idaho license plates, he

11   advised dispatch that he may have seen the stolen van and was going to follow it.  Junio Decl. ¶ 6;

12   CAD at 1.

13        Defendant Junio followed the van up the onramp and onto the Bay Bridge towards

14   Oakland.  Junio Decl. ¶ 7.  Another officer, Defendant Espinoza, arrived as back up and pulled

15   onto the Bay Bridge to join Defendant Junio.  *Id.*  After about 300 yards, Defendant Junio

16   activated his lights and sirens.  *Id.*  However, the van took off.  *Id.*

17        The van sped up to 70 miles per hour, headed towards Treasure Island and then Oakland.

18   *Id.* ¶ 8.  Two more patrol cars, driven by San Francisco Police Officers Cotter and Parra (both non-

19   parties), joined the pursuit.  *Id.* at ¶ 9.  Halfway across the bridge, at Treasure Island, the van

20   slowed to 30 miles per hour but did not exit.  *Id.*  It instead immediately sped back up.  *Id.*  The

21   van entered the steep S-curve after Treasure Island at 80 to 85 miles per hour, swerving from lane

22   to lane.  *Id.*  Out of the turn, the van accelerated to 90 miles per hour as it wandered across three

23   lanes.  *Id.* at ¶ 10.  The pursuing officers described over their radios that the van was changing

24   lanes recklessly and driving at unsafe speeds.  CAD at 2.  Multiple police cars pursued the van,

25   and near the end of the bridge, it began smoking and slowing down.  Junio Decl. ¶ 11; Oldfather

26   Decl., Exs. C&D (DashCam Video 1) at 01:13-01:30, (DashCam Video 2) at 00:30-00:50.

27   _____

28        [4] At his deposition, Plaintiff testified that he was the driver of the van.  Jordan Depo. at
     102:5-103:2.

3

The van took the first exit, towards Maritime Street and the Oakland docks.  Junio Decl. ¶ 11.  The van stopped halfway down the West Grand exit ramp just long enough for the door to open and Plaintiff to jump out.  Oldfather Decl., Ex. L (Jordan Depo.) at 103:1-15.  Plaintiff jumped over the retaining wall and kept running through a "grassy field area."  DashCam Video 1 at 02:40-2:55; Cabuntala Decl. ¶¶ 5-6; Jordan Depo. at 103:6-105:9.  The van accelerated again, driving down the onramp and onto Maritime Street, where it eventually stopped.  DashCam Video 1 at 02:55-4:15.  At that point, officers had the van surrounded.  *Id.*  Finally, Flloyd Jordan, Plaintiff's brother, exited the van with his hands up and surrendered to police.  *Id.* at 4:15-4:35.

### 2.  Plaintiff Flees on Foot and Hides

Defendant Espinoza was one of the officers following the van when Plaintiff jumped out. Espinoza Decl. ¶ 2.  Defendant Espinoza learned over his radio that some of the officers had started to chase Plaintiff into the wooded area.  *Id. ¶* 3.  Plaintiff had climbed up a fence with barbed wire on top and was running into a wooded area.  Cabuntala Decl. ¶¶ 5-6.  To prevent officers accidentally targeting each other, Defendant Espinoza ordered all the officers to set up a perimeter.  Espinoza Decl. ¶ 3.

With the perimeter set up around Plaintiff's hiding area, Defendant Espinoza ordered Plaintiff over the loudspeaker to come out with his hands up multiple times.  *Id.* ¶ 6.  When Plaintiff did not comply, Defendant Espinoza ordered a helicopter to fly over the area with an infrared camera.  *Id.* ¶¶ 6-7.  The infrared camera located Plaintiff.  *Id. ¶* 8.  Unable to obtain a K-9 unit from Oakland, Defendant Espinoza ordered specialist officers, a group of highly trained officers, to enter the perimeter and apprehend Plaintiff.  *Id. ¶* 8.

### 3.  Plaintiff's Arrest

The specialist officers—Defendants Hui, Hinds, Cabuntala, and Liberta—prepared to enter the perimeter area where Plaintiff was hiding.  Cabuntala Decl. ¶¶ 7-9.  From the radio traffic, they knew they were looking for a black male, approximately six feet tall, wearing a light gray hoodie. CAD at 4.  They knew the suspect had robbed a couple at gunpoint, led officers on a high speed chase across the Bay Bridge, and refused to surrender peacefully.  Cabuntala Decl. ¶ 3; Hui Decl. ¶ 3; Hinds Decl. ¶ 3; Liberta Decl. ¶ 3.

United States District Court
Northern District of California

The officers had been listening to their radios as they approached the scene.  Cabuntala Decl. ¶ 4; Hui Decl. ¶ 4; Hinds Decl. ¶ 4; Liberta Decl. ¶ 4.  The following is a transcript of what was stated on the radio:

> 1:40:28 SUPP TX: ELDERLY X [WOMAN] WAS FORCED OUT OF HER VEH BY FORCE.
> . . .
> 1:41:04 DP03 SUPP TX: SUBJS DID HAVE A GUN . . . . THEY BROKE HER WIMDOW [SIC] TO GET THE KEYS FROM HER.
> . . .
> 1:45:21 SU04 CODE-4 C33 1ST/HARRISON BEHIND VEH
> . . .
> 1:45:40 DP12 MISC 3B13E, BEHIND THE VEHICLE, RIGHT BEHIND HIM, DID NOT LIGHT HIM UP YET.
> . . .
> 1:46:36 DP 16 MISC 3B13E, #4 LANE GOING 70 MPH.
> . . .
> 1:47:30 SU04 MISC 3B12E, CONTINUING BENEATH TUNNEL, VEH GOING 80-85 MPH AT THE TURN
> 1:47:30 DP12 MISC 3B13E, GOING 80-85 MPH AT S CURVE
> . . .
> 1:48:45 DP12 MISC 3B13E, VEHICLE NOW IN #3 LANE, SWERVING BETWEEN 1 & 3, APPROACHING EXIT OFF EAST END OF BAY BRIDGE
> . . .
> 1:50:57 SU03 MISC ONE BAILED OUT
> 1:51:05 DP12 MISC 3B13E, SET UP FOOT PURSUIT, 1 SUSPECT BAILED OUT, STAY W/ THE DRIVER
> . . .
> 1:55:15 DP16 MISC 3B16E, SUSP CLIMBED OVER BARBED WIRE FENCE
> . . .
> 2:04:52 DP12 MISC 3B13E, OUTSTANDING SUSPECT BM [BLACK MALE], HAS LIGHT GREY HOODIE MIGHT BE OVER HIS HEAD, MIGHT BE 6 FT
> . . .
> 2:07:57 DP16 MISC 3A13E, GUN SIMULATED . . . NEVER SEEN.
> . . .
> 2:11:49 SU03 MISC ONE SUSP IN CUSTODY.  DRIVER IS STILL OUTSTANDING
> 2:12:16 DP16 MISC 3B16E OUTSTANDING SUSP: BMA [BLACK MALE] STOCKY BUILD SHORT BLK HAIR, LSW [LAST SEEN WEARING] GRY JKT OR SWEATSHIRT

CAD at 1-4 (brackets added).  Gathering from their radios that the suspect robbed a woman at gunpoint, led officers on a high speed chase, and was hiding a dark brushy area, the officers put on raid jackets with SFPD patches on both sides, and entered the perimeter area through a hole in the fence.  Cabuntala Decl. ¶¶ 7-9; Hui Decl. ¶¶ 7-9; Hinds Decl. ¶¶ 7-9; Liberta Decl. ¶¶ 8-9.

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1    It was a "dark and wooded" area, and it was "very difficult to see." Cabuntala Decl. ¶ 8.

2    Defendants Liberta and Hui drew their firearms while Defendants Cabuntala and Hinds were

3    designated runners. Liberta Decl. ¶ 10. The officers yelled at Plaintiff numerous times,

4    identifying themselves as police and telling Plaintiff to surrender, to no avail. Cabuntala Decl. ¶ 9;

5    Hinds Decl. ¶ 9; Hui Decl. ¶ 9; Liberta Decl. ¶ 9. Each officer believed he was about to encounter

6    a suspect who was dangerous, desperate, and armed. Cabuntala Decl. ¶ 10; Hinds Decl. ¶ 11; Hui

7    Decl. ¶ 12; Liberta Decl. ¶ 11.

8    Defendant Hui spotted Plaintiff in the bushes. Hui Decl. ¶ 10. Defendant Hui pointed his

9    firearm at Plaintiff and yelled, "Hey, let me see your hands." *Id.* Plaintiff crawled, jumped up and

10   started running again. *Id.* ¶ 11; Hinds Decl. ¶ 10; Cabuntala Decl. ¶ 11. Defendant Hui and the

11   other officers started running after Plaintiff, again telling him to stop. Cabuntala Decl. ¶ 12; Hui

12   Decl. ¶13; Hinds Decl. ¶ 10; Liberta Decl. ¶ 12.

13   Defendant Cabuntala was the fastest officer and reached Plaintiff first. Cabuntala Decl.

14   ¶ 13. Defendant Cabuntala yelled, "Stop, police!" *Id.* ¶ 12. He grabbed the back of Plaintiff's

15   jacket while they were both running. *Id.* ¶ 13. Plaintiff spun around and swung his fist at

16   Defendant Cabuntala's face. *Id.* ¶ 14. Defendant Cabuntala could not avoid Plaintiff's fist and

17   instead tried to absorb its blow. *Id.* Plaintiff struck Defendant Cabuntala in the chin. *Id.* As

18   Defendant Cabuntala tried to move with the punch, it threw him off balance and he fell to the

19   ground, pulling Plaintiff with him. *Id.* Plaintiff landed on top of Defendant Cabuntala. *Id.*

20   Concerned that a potentially armed suspect "was on top of [him] in a position of advantage,"

21   Defendant Cabuntala quickly pushed himself away to create distance and tried to gain control of

22   Plaintiff's left arm. *Id.* ¶¶ 15-16. Plaintiff pulled his arms under his body, refused to show his

23   hands, and tried to get back up. *Id.* ¶ 16. Defendant Cabuntala identified himself as a police

24   officer and ordered Plaintiff to stop resisting. *Id.* Fearing that Plaintiff was reaching for a

25   weapon, Defendant Cabuntala delivered multiple "distractionary strikes"[5] with his fist to

26

27   _____

     [5] Defendant Cabuntala claims that the "distractionary strikes" he used against Plaintiff are

28   "not designed to cause injury." Cabuntala Decl. ¶ 16, 26. Instead, Defendant Cabuntala claims
     that they are moderately forced strikes that are designed to shock a Plaintiff into compliance. *Id.*

United States District Court
Northern District of California

Plaintiff's Zone 1 (torso) while trying to gain control of Plaintiff's left arm.  *Id.* ¶¶ 16-17.

Nonetheless, Plaintiff "continued to resist even after the strikes."  *Id.* ¶ 17.

Defendant Hinds was chasing Plaintiff about 5 to 10 feet behind Defendant Cabuntala when he saw Plaintiff punch Defendant Cabuntala.  Hinds Decl. ¶ 12.  Defendant Hinds assisted Defendant Cabuntala in tackling Plaintiff to the ground.  *Id.* ¶ 13.  Defendant Hinds saw the Plaintiff roll onto his stomach and shove his hands underneath him.  *Id.* ¶ 13.  Defendant Hinds tried to gain control of Plaintiff's hands, but Plaintiff resisted, tensing his muscles to fight against Defendant Hinds.  *Id.* ¶ 14.  Because of the radio traffic and initial call of a robbery with a firearm, Defendant Hinds suspected that Plaintiff had a firearm.  *Id.*  Defendant Hinds delivered multiple elbow and knee strikes to Plaintiff's torso area.  *Id.*  The strikes were conducted with "moderate force."  *Id.* ¶¶ 14-15, 18.  Even after the strikes, Defendant Hinds claims that Plaintiff kept resisting, trying to pull his arms back under his body, trying to stand up and tensing his muscles.  *Id.* ¶¶ 15,16.

By the time Defendant Hui caught up, Plaintiff was already on the ground with his hands under his body, struggling with Defendants Cabuntala and Hinds.  Hui Decl. ¶ 13.  Defendant Hui yelled, "Hey, give me your hand. Give me your hand."  Defendant Hui was concerned that Plaintiff had a firearm.  *Id.* ¶ 13.  Despite Defendants Hui, Cabuntala, and Hinds trying to gain control of Plaintiff's hands and arms, Plaintiff kept tucking his hands under him and thrashing around.  *Id.* ¶ 14.  He also kept trying to pull his arms under his body to stand up.  *Id.* ¶ 15.   To gain control of Plaintiff's hands, Defendant Hui delivered several knee strikes to Plaintiff's rib area.  *Id.* ¶ 14.    Finally, Defendant Hui was able to help pry Plaintiff's arms out from underneath him.  *Id.* ¶ 16.

Defendant Liberta also arrived while Plaintiff was "fighting aggressively" with Defendants Cabuntala and Hinds.  Liberta Decl. ¶ 12.  Defendant Liberta was immediately concerned because Plaintiff still had his hands under his body and the original call indicated that Plaintiff was armed.  *Id.* ¶ 12.  Defendant Liberta described the struggle as a "wild, violent grappling match."  *Id.* ¶ 13.  Plaintiff was kicking his legs, pulling his arms under his body, pushing up, and fighting with the officers.  *Id.*  Defendant Liberta was unable to control Plaintiff's hands and body.  *Id.*  Defendant

United States District Court
Northern District of California

1    Liberta delivered several closed fist strikes to Plaintiff's torso and leg area, and he also used knee

2    strikes to pin Plaintiff's legs down.  *Id.*  Defendant Liberta claims that the strikes were not hard

3    enough to injure Plaintiff, but just enough to shock him.  *Id.* ¶ 13.  During the entire encounter, the

4    officers were yelling at Plaintiff to give up his hands.  *Id.* ¶ 14.

5         Finally, after a long struggle, which "seemed like a minute" to Defendant Hinds, officers

6    were able to get a hold of Plaintiff's hands and handcuff him.  Liberta Decl. ¶ 14; Cabuntala Decl.

7    ¶ 21; Hinds Decl. ¶ 16.

8         Once Plaintiff was handcuffed and sitting up, Defendant Cabuntala asked Plaintiff his

9    name.  Cabuntala Decl. ¶ 22.  Plaintiff did not respond.  *Id.*  Plaintiff just looked of Defendant

10   Cabuntala and then looked away.  *Id.*  Defendant Cabuntala searched Plaintiff's pockets and found

11   a wallet with a I.D. inside that belonged to William Willoughby, the other victim who was in the

12   car with the elderly woman.  *Id.* ¶ 23.

13        As Plaintiff was sitting there, Defendant Hinds noticed that Plaintiff looked like he had lost

14   consciousness but his eyes were open, and he did not appear to be breathing.  Hinds Decl. ¶ 17.

15   Defendant Liberta immediately laid Plaintiff on his back and began chest compressions.  Liberta

16   Decl. ¶ 15.  Defendant Hui tipped Plaintiff's head to open his airway.  *Id.*  After about 5-10

17   compressions, Plaintiff seemed to recover.  *Id.*  Defendant Liberta lay Plaintiff on his side and

18   waited for paramedics.  *Id.* ¶¶ 15-16.

19        **4.  Plaintiff's Injuries**

20        When the paramedics arrive, they noted that Plaintiff initially appeared to be unconscious.

21   Oldfather Decl., Ex. J, (Summit Medical Records) at 25.  Officers had informed the paramedics

22   that after Plaintiff's arrest, he appeared to have seizure "for about a minute."  *Id.*  When

23   paramedics told Plaintiff that they were going to give him an "NPA"[6] if he did not wake up, he

24   suddenly woke up.  The paramedics completed a head to toe assessment and found no injuries

25   except for slight reddening on his forehead and complaints of "face/jaw pain."  *Id.*  Plaintiff told

26   _____

27        [6] According to the internet encyclopedia, Wikipedia, "NPA" stands for nasopharyngeal
     airway, which is a tube that is designed to be inserted into the nasal passageway to secure an open

28   airway.  *See* https://en.wikipedia.org/wiki/Nasopharyngeal_airway (last accessed on November 13,
     2015).

United States District Court
Northern District of California

1    the paramedics that he had recently been diagnosed with seizures and did not take any medication

2    for them.  *Id.*  The paramedics then took Plaintiff to the Alta Bates Summit Medical Center to be

3    medically cleared.  Liberta Decl. ¶ 16.

4         At the hospital, because of the claimed seizure and strange unconsciousness symptoms, the

5    hospital tested Plaintiff for drugs and alcohol.  Summit Medical Records at 17, 19.  Plaintiff tested

6    positive for THC and alcohol.  *Id.*  Doctors also performed a CT scan, which came back negative.

7    *Id.* at 22.  There was no internal bruising or signs of trauma to the brain.  *Id.*  Plaintiff did not have

8    any facial or skull fractures.  *Id.*  A complete physical exam found that Plaintiff had sustained a

9    "minor head injury" and suffered "multiple abrasions" around both eyes and "numerous abrasions

10   to forehead and face." *Id.* at 2, 4.  In addition, Plaintiff was "unable to fully open [his] jaw." *Id.*

11   The medical staff noted that Plaintiff had "[n]o fever, chest pain, difficulty breathing, cough or

12   abdominal pain [and] . . . [n]o nausea or vomiting." *Id.*  There was no "edema" or swelling in his

13   "extremities." *Id.*  Plaintiff was discharged to the jail in "stable condition" after his clinical report

14   was electronically signed at 5:55 a.m. *Id.* at 4, 5.

15        When he arrived at the San Francisco County Jail, Plaintiff told jail medical staff that he

16   was being "seen for seizures" at San Francisco General Hospital, and that he has a history of

17   "blacking out."  Oldfather Decl., Ex. K (San Francisco County Jail Medical Record).

18        During his deposition, Plaintiff confirmed that photos taken that night of his face

19   accurately depicted the injuries that he received that night.  Jordan Depo. at 148:2-149:23.  These

20   photos show minor abrasions to his face.  Oldfather Decl., Exs. F, G (Photos).

21   **II.    DISCUSSION**

22        **A.    Legal Standard**

23        Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment

24   on some or all of the claims or defenses presented in an action.  Fed. R. Civ. P. 56(a)(1).  "The

25   court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

26   material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see Anderson v.*

27   *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The movant bears the initial burden of

28   demonstrating the basis for the motion and identifying the portions of the pleadings, depositions,

9

United States District Court
Northern District of California

1   answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable

2   issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P.

3   56(c)(1)(A) (requiring citation to "particular parts of materials in the record").  If the moving party

4   meets this initial burden, the burden then shifts to the non-moving party to present specific facts

5   showing that there is a genuine issue for trial.  *See Celotex*, 477 U.S. at 324; *Matsushita Elec.*

6   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

7          "On a motion for summary judgment, 'facts must be viewed in the light most favorable to

8   the nonmoving party only if there is a 'genuine' dispute as to those facts.'" *Ricci v. DeStefano*,

9   557 U.S. 557, 586 (2009) (quoting in part *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  "Only

10  disputes over facts that might affect the outcome of the suit under the governing law will properly

11  preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will

12  not be counted." *Anderson*, 477 U.S. at 248.  A factual dispute is genuine if it "properly can be

13  resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party."

14  *Id.* at 250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from

15  which a reasonable jury, viewing the evidence in the light most favorable to that party, could

16  resolve the material issue in his or her favor.  *Id.*  "If the evidence is merely colorable, or is not

17  significantly probative, summary judgment may be granted."  *Id.* at 249-50 (internal citations

18  omitted).  Only admissible evidence may be considered in ruling on a motion for summary

19  judgment.  *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002).

20         A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is

21  based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder*

22  *v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir.1995) (treating plaintiff's verified complaint

23  as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746,

24  plaintiff stated under penalty of perjury that contents were true and correct, and allegations were

25  not based purely on his belief but on his personal knowledge).

26         Here, Plaintiff's amended complaint and opposition were verified, and therefore will be

27  considered as evidence for purposes of deciding the motion. Dkts. 9, 69.  Plaintiff's deposition

28  testimony, as submitted by Defendants, will also be considered.

**B.      Fourth Amendment Claim**

**1.    Applicable Law**

The constitutional right at issue when it is alleged that a law enforcement officer used excessive force in the course of an arrest or other seizure is the Fourth Amendment right to be free from "unreasonable . . . seizures."  U.S. Const. amend. IV; *see Graham v. Connor*, 490 U.S. 386, 394 (1989).  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake ."  *Id.* at 396 (citations and internal quotation marks omitted).  Specifically, the force applied by officers must be balanced against the need for that force.  *See Drummond v. City of Anaheim*, 343 F.3d 1052, 1058-60 (9th Cir. 2003).

In *Graham*, the United States Supreme Court listed several factors to determine the reasonableness of the use of force under the Fourth Amendment:  (1) severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight, and (4) whether the totality of the circumstances justified a particular sort of seizure.  490 U.S. at 396.  These factors are not exclusive, however, and the totality of the particular circumstances of each case must be considered.  *Fikes v. Cleghorn*, 47 F.3d 1011, 1014 (9th Cir. 1995).  Furthermore, the reasonableness of a "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.

Police officers are not required to use the least intrusive degree of force possible; they are required only to act within a reasonable range of conduct.  *See Forrester v. City of San Diego*, 25 F.3d 804, 806-07 (9th Cir. 1994), *cert. denied*, 513 U.S. 1152 (1995) (using minimal and controlled force in manner designed to limit injuries reasonable); *see also Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (requiring officers to find and choose least intrusive alternative would require them to exercise superhuman judgment), *cert. denied*, 515 U.S. 1159 (1995).  "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting

them." *Graham*, 490 U.S. at 397 (citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Police officers may be held liable if they have an opportunity to intercede but fail to do so when their fellow officers violate the constitutional rights of a plaintiff. *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000); *Motley v. Parks*, 383 F.3d 1058, 1071 (9th Cir. 2004). The passive defendant violates a constitutional right that "is analytically the same as the right violated by the person who strikes the blows." *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996). On the other hand, if an officer is not present during a constitutional violation, or if a violation happens so quickly that an officer had no "realistic opportunity" to intercede, then the officer is not liable for failing to intercede. *Cunningham*, 229 F.3d at 1290.

A defendant is entitled to summary judgment on a Fourth Amendment use of force claim where there is no genuine issue for trial because the record taken as a whole would not lead a rational trier of fact to find for the plaintiff. *See Henderson v. City of Simi Valley*, 305 F.3d 1052, 1061 (9th Cir. 2002) (summary judgment in favor of defendant proper where evidence in the record in support of plaintiff's excessive force claim was "woefully sparse"). Similarly, summary judgment will be available if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances. *See Johnson v. County of Los Angeles*, 340 F.3d 787, 792-93 (9th Cir. 2003) (officer's actions dragging suspect out of a vehicle were reasonable where suspect was stuck and officer was afraid suspect had weapon).

On the other hand, if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The district court may not resolve disputed issues of material fact by crediting one party's version of events and ignoring another. *Wall v. County of Orange*, 364 F.3d

*United States District Court*
*Northern District of California*

1107, 1111 (9th Cir. 2004) ("By deciding to rely on the defendants' statement of fact [in deciding a summary judgment motion], the district court became a jury.").

Here, Plaintiff alleges that the record shows that Defendants Hinds, Cabuntala, Hui and Liberta ("Primary Defendants") used excessive force in arresting him after he had already been subdued. The Primary Defendants acknowledge that they did use force on Plaintiff, but assert that the force used was reasonable to effect Plaintiff's arrest. Meanwhile, the Court construes Plaintiff's claims against the remaining Defendants—Defendants Junio, Espinoza, Jonas, Ryan, Mason, and Shablinskiy ("Secondary Defendants")—as a claim that they failed to intervene to prevent the assault. Moreover, while Defendants deny that the Secondary Defendants were involved in the use of force, Plaintiff claims otherwise as to six of them.

### 2.  Analysis of Merits of Claim Against Primary Defendants

The Primary Defendants acknowledge that they did use force on Plaintiff, but assert that they "used minimally invasive strikes to control a suspect who they reasonably believed was armed, who had refused to show his hands and who had just assaulted a police officer." Dkt. 59 at 16. However, considering the various factors identified by *Graham*, the Court concludes that whether the force used was unconstitutionally excessive cannot be resolved at this juncture.

### a.  Severity of the crime

Plaintiff's offense was serious. He was arrested for carjacking an elderly woman and her male companion at gunpoint. The situation escalated when Plaintiff attempted to flee officers in the stolen van and led them in a high speed pursuit across the Bay Bridge. However, material issues of fact are in dispute as to what happened after the pursuit ended.

Defendants claim that when Plaintiff was forced to flee on foot, he hid from the officers and ignored their orders to surrender. The Primary Defendants made contact with Plaintiff, but he ran away and forced the officers to chase him. When Defendant Cabuntala caught up with Plaintiff, Plaintiff refused to obey Defendant Cabuntala's order to stop and Plaintiff punched the officer. The Primary Defendants claim that Plaintiff continued to resist and struggle with them. The Primary Defendants were only able to successfully arrest Plaintiff after delivering multiple strikes to his torso, rib area, and legs.

13

United States District Court
Northern District of California

By contrast, Plaintiff denies in his verified amended complaint that he resisted the officers' attempts to arrest him.  Dkt. 9 at 3.  In his verified opposition, Plaintiff specifically claims that the Primary Defendants used the aforementioned force after he was "lying face down in a surrendering position, subdued and handcuffed."  Dkt. 69 at 17.

### b.  Immediacy of threat to the safety of officers or others

No genuine dispute exists that Plaintiff posed a threat to himself, to the officers, and to others on the road during the high speed pursuit because he was changing lanes recklessly and driving at unsafe speeds.  However, after the pursuit ended, material issues of fact remain in dispute as to whether Plaintiff was still a threat.

According to Defendants, after Plaintiff abandoned the van, he climbed up a fence with barbed wire on top and ran into a wooded area.  When officers finally made contact with Plaintiff, he punched an officer and refused to follow the officers' orders to surrender, and the threat to officers increased as Plaintiff (whom officers believed was armed with a gun) continued to disregard commands to surrender his hands.

By contrast, Plaintiff claims that he was no longer a threat to the officers after he abandoned the van because he had surrendered and was lying face down on the ground.

### c.  Active resistance to arrest

The undisputed evidence also shows that Plaintiff actively resisted arrest by taking flight in the van and leading offices in a high speed pursuit.  Thereafter, Defendants and Plaintiff dispute whether Plaintiff continued to resist arrest.  Defendants claim that after Plaintiff abandoned the van, he climbed up a fence with barbed wire on top and ran into a wooded area.  They add that Plaintiff ignored the Primary Defendants' commands to surrender, punched an officer, and then physically struggled while the officers' attempted to restrain him.  By contrast, Plaintiff claims that he surrendered and did not resist when the Primary Defendants handcuffed him.

### d.  Quantum of force used

The force used by the Primary Defendants consisted of Plaintiff being struck multiple times to the torso, rib area, and legs by either the hand-strikes or knee-strikes from these four officers.  This force persisted for a period of a few minutes.  The parties dispute whether Plaintiff

14

resisted during the use of force.  Defendants claim that each time Plaintiff was struck by one of the Primary Defendants, he continued resisting the officers' efforts to get him to show his hands or struggling against their efforts to put restraining devices on him.  Plaintiff, on the other hand, claims that he had already surrendered and was lying face down prior to the Primary Defendants' use of force against him.

### e.  Injuries

Plaintiff claims that after the Primary Defendants' use of force, he suffered a "seizure for the first time in his life."  Dkt. 9 at 3.  Plaintiff also claims that he "went in and out of consciousness twice."  *Id.*

Defendants disagree and argue that the evidence of any of the aforementioned injuries is weak.  Defendants argue that Plaintiff failed to provide any medical records in support of his assertions or any evidence that the injuries stemmed from any particular Defendant's actions as opposed to his efforts to resist the officers.  Dkt. 59 at 15-16 (citing *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (concluding allegations of injury without medical records or other evidence of injury insufficient to establish excessive force)).

### f.  Efforts to temper use of force

Finally, the Primary Defendants claim they attempted to temper the severity of their response by giving Plaintiff numerous oral commands to surrender and, later, to comply with their orders to show his hands before using force on him.  They stress that the force used was preceded by and responsive to Plaintiff's resistant behavior.

Meanwhile, as mentioned above, Plaintiff claims that he did not resist during the use of force.  Further, he claims that "[o]ne of the officers shouted 'stop resisting!' as [he] lay[] there motionless."  Dkt. 9 at 3.  Thus, Plaintiff asserts that there was no need for any such warnings against resisting arrest because he had already surrendered prior to the Primary Defendants' use of force.

In sum, the parties relay distinctly different versions of what occurred.  Given Plaintiff's injuries, resolution cannot occur by way of summary judgment on the current state of the record.  Plaintiff attests that the Primary Defendants struck him multiple times, inflicting blows to his

United States District Court
Northern District of California

1    torso, rib area, and legs.  Dkt. 9 at 3.  Even if the Primary Defendants believed that Plaintiff posed

2    an immediate threat to their safety, this threat must be evaluated within the totality of the

3    circumstances and balanced against the amount of force Defendants applied.  *Graham*, 490 U.S. at

4    396; *Drummond*, 343 F.3d at 1058-60.  Plaintiff alleges that he was not actively resisting arrest,

5    and that he was lying face down prior to the Primary Defendants' use of force.  Dkt. 9 at 3.

6    Without more, these disputes of material fact remain unresolved.  *See Drummond*, 343 F.3d at

7    1058-60 (officers used excessive force in kneeling and pressing their weight against the torso and

8    neck of a suspect who was handcuffed and lying on the ground without offering resistance);

9    *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (officers used excessive force

10   when they punched plaintiff and used a gang tackle and hobble restraints to take him into

11   custody).  Therefore, the Court finds that the Primary Defendants are not entitled to summary

12   judgment on the excessive force claim as a matter of law.

### 3.   Analysis of Merits of Claim Against Secondary Defendants

14       In his verified opposition, Plaintiff claims that the Secondary Defendants are liable because

15   they all were "on the scene when [he] endured excessive force."  Dkt. 69 at 17; *see id.* at 8

16   (Cunnie), 9 (Junio), 10 (Shablinskiy), 11 (Mason), 12 (Ryan), 13-14 (Jonas), 14 (Maguire), 15-16

17   (Espinoza).  It seems that Plaintiff is arguing that the Secondary Defendants were all present at the

18   scene of the arrest and witnessed the use of excessive force by the Primary Defendants, therefore

19   they are all liable for failing to intervene.  If the force used against Plaintiff by the Primary

20   Defendants did amount to a Fourth Amendment violation, the Secondary Defendants are

21   potentially liable for failing to intervene to prevent the constitutional violation.  In addition, as

22   further explained below, Plaintiff claims that six of the eight Secondary Defendants were actually

23   involved in the use of force against Plaintiff, and their denials of doing so are "p[e]rjured

24   statements in the form of Declarations [in Support] of Summary Judgment by all officers."  *Id.* at

25   17; *see id.* at 10 (Shablinskiy), 11 (Mason), 13 (Ryan), 14 (Jonas), 15 (Maguire), 16 (Espinoza).

26       However, in their motion for summary judgment, Defendants argue that the Secondary

27   Defendants did not participate in the use of force against Plaintiff and that they could not be liable

28   for failing to intervene because they had no opportunity to intervene to prevent the alleged acts of

excessive force.  The Court considers each Secondary Defendant in turn.

### a.  Defendant Junio

Defendants point out that Defendant Junio pursued Plaintiff across the Bay Bridge but did not participate in the arrest.  Junio Decl. ¶¶ 2-12.  Defendant Junio claims that he did not use any force against Plaintiff.  *Id.* ¶ 13.  Plaintiff argues that Defendant Junio "assisted the several officers that entered the perimeter when appl[y]ing excessive force by kicking and stomping the plaintiff." Dkt. 69 at 9.  Plaintiff has created a genuine issue of material fact as to whether Defendant Junio had an opportunity to intervene to prevent the use excessive force against Plaintiff by the Primary Defendants.  *See Koon*, 34 F.3d at 1447 n.25 (finding liability for failure to intervene where one officer witnesses another striking blows).  Therefore, the Court finds that Defendant Junio is not entitled to summary judgment on the excessive force claim as a matter of law.

### b.  Defendant Espinoza

Defendants point out that Defendant Espinoza pursued Plaintiff across the Bay Bridge, but did not participate in the arrest.  Espinoza Decl. ¶ 9.  Defendant Espinoza attests to the fact that he "ordered a group of specialist officers [i.e., the Primary Defendants] to enter the area and apprehend Plaintiff."  *Id.* at 8.  However, Defendant Espinoza claims that he neither used force against Plaintiff nor was present for the arrest or use of force by the Primary Defendants.  *Id.* at 9. In contrast, Plaintiff claims that after he was "in custody and lying face down on the ground," Defendant Espinoza entered the perimeter and "participated in the excessive force by stomp[]ing on Plaintiff's head and [when he] held Plaintiff's head down by keeping his foot in place on the side of Plaintiff's head, yelling profane verbiage while other officers continued to apply excessive force."  Dkt. 69 at 16.  Plaintiff adds that Defendant Espinoza "did not stop or prevent the officers from applying excessive force to the plaintiff who was clearly not resisting."  *Id.*

Here, not only has Plaintiff created a genuine issue of material fact as to whether Defendant Espinoza was involved in the use of unconstitutionally excessive force in striking a subdued suspect multiple times, *see Drummond*, 343 F.3d at 1058-60, but also as to whether Defendant Espinoza had an opportunity to intervene to prevent the use excessive force against Plaintiff by the Primary Defendants, *see Koon*, 34 F.3d at 1447 n.25.  Therefore, the Court finds

United States District Court
Northern District of California

1    that Defendant Espinoza is not entitled to summary judgment on the excessive force claim as a

2    matter of law.

3                            **c.  Defendants Ryan and Jonas**

4            Defendants claim that Defendants Ryan and Jonas responded to the call of the armed

5    carjacking, and provided back up at the scene.  Ryan Decl. ¶ 2; Jonas Decl. ¶ 2.  Defendants Ryan

6    and Jonas claim they did not take partake in the arrest or use any force.  *Id.*

7            Meanwhile, Plaintiff claims that Defendant Ryan "participated in the excessive force by

8    stomp[]ing and kicking Plaintiff in the right side of [his] ribs, leg and right hip area."  Dkt. 69 at

9    13.  Plaintiff adds that Defendant Ryan "held . . . his foot down on Plaintiff's right hip area, while

10   other officers continued to apply excessive force."  *Id.*  Plaintiff also claims that Defendant Jonas

11   "participated in the excessive force by kicking, stomp[]ing and hitting Plaintiff while other officers

12   continued to apply excessive force."  *Id.* at 14.

13           Plaintiff has created a genuine issue of material fact as to whether Defendants Ryan and

14   Jonas were involved in the use of unconstitutionally excessive force in striking a subdued suspect

15   multiple times.  *See Drummond*, 343 F.3d at 1058-60.  And Plaintiff has also created a genuine

16   issue of material fact as to whether Defendants Ryan and Jonas had an opportunity to intervene to

17   prevent the use excessive force against Plaintiff by the Primary Defendants.  *See Koon*, 34 F.3d at

18   1447 n.25.  Therefore, the Court finds that Defendants Ryan and Jonas are not entitled to summary

19   judgment on the excessive force claim as a matter of law.

20                            **d.  Defendant Maguire**

21           Defendants point out that Defendant Maguire was the investigating officer who

22   interviewed Plaintiff after the arrest and wrote the investigatory chronology.  Maguire Decl. ¶ 2.

23   Defendant Maguire claims he did not take part in the arrest or use any force against Plaintiff.  *Id.*

24           Plaintiff claims that Defendant Maguire "participated in the excessive force by kicking and

25   stomp[]ing the back and right side of Plaintiff's head repeatedly while yelling racial [epithets]."

26   Dkt. 69 at 15.  Plaintiff claims that the other officers "held Plaintiff down and continued the

27   excessive force [against him]."

28           Once again, Plaintiff has created a genuine issue of material fact as to whether Defendant

United States District Court
Northern District of California

18

1   Maguire was involved in the use of unconstitutionally excessive force in striking a subdued

2   suspect multiple times.  *See Drummond*, 343 F.3d at 1058-60.  Plaintiff has also created a genuine

3   issue of material fact as to whether Defendant Maguire had an opportunity to intervene to prevent

4   the use excessive force against Plaintiff by the Primary Defendants.  *See Koon*, 34 F.3d at 1447

5   n.25.  Therefore, the Court finds that Defendant Maguire is not entitled to summary judgment on

6   the excessive force claim as a matter of law.

### e.   Defendant Mason

8   Defendants contend that Defendant Mason was involved in being part of the perimeter that

9   prevented Plaintiff from escaping after he abandoned the van.  Mason Decl. ¶ 2.  Defendant

10   Mason also helped coordinate the medical response team after the specialist officers alerted him

11   that Plaintiff had a medical issue, and he accompanied Plaintiff to the hospital.  *Id.* ¶ 3.  Defendant

12   Mason claims that he did not participate in the arrest or use any force against Plaintiff.  *Id.*

13   Plaintiff claims that Defendant Mason "participated in the excessive force when he

14   stomp[]ped [on] Plaintiff on the back of his head and delivered kicks to the face, yelling racial

15   epithets while other officers held Plaintiff down and other officer[s] applied excessive force when

16   Plaintiff was handcuffed."  Dkt. 69 at 11.

17   Here, again, Plaintiff has created a genuine issue of material fact as to whether Defendant

18   Mason was involved in the use of unconstitutionally excessive force in striking a subdued suspect

19   multiple times, *see Drummond*, 343 F.3d at 1058-60, and also as to whether Defendant Mason had

20   an opportunity to intervene to prevent the use excessive force against Plaintiff by the Primary

21   Defendants, *see Koon*, 34 F.3d at 1447 n.25.  Therefore, the Court finds that Defendant Mason is

22   not entitled to summary judgment on the excessive force claim as a matter of law.

### f.   Defendant Cunnie

24   Defendants point out that Defendant Cunnie's main role was that he rode in the ambulance

25   with Plaintiff to the hospital.  Cunnie Decl. ¶ 3.  Defendant Cunnie also searched Plaintiff in the

26   ambulance and found a small yellow tool.  *Id.* ¶ 4.  Defendant Cunnie's experience led him to

27   identify it as a tool used to break windows.  *Id.*  After Plaintiff was medically cleared, Defendant

28   Cunnie transported him to Central Station for booking.  *Id.* ¶ 6.  Defendant Cunnie claims he did

United States District Court
Northern District of California

19

United States District Court
Northern District of California

1    not take part in the arrest or use any force on Plaintiff.  *Id.* ¶ 2.

2         Plaintiff claims that Defendant Cunnie was "on the scene and was a part of several other

3    SFPD and CHP officers that entered the perimeter and assisted in the excessive force by kicking

4    and stomp[]ing [on] Plaintiff."  Dkt. 69 at 8.  Plaintiff has created a genuine issue of material fact

5    as to whether Defendant Cunnie had an opportunity to intervene to prevent the use excessive force

6    against Plaintiff by other officers.  *See Koon*, 34 F.3d at 1447 n.25.  Therefore, the Court finds that

7    Defendant Cunnie is not entitled to summary judgment on the excessive force claim as a matter of

8    law.

9                      **g.   Defendant Shablinskiy**

10        Defendants point that Defendant Shablinskiy's main role was that after officers

11   apprehended Plaintiff, he "went to the hospital where plaintiff was medically cleared."

12   Shablinskiy Decl. ¶ 3.  Defendant Shablinskiy claims that he did not take part in the arrest or use

13   any force against Plaintiff.  *Id.*

14        Plaintiff claims that Defendant Shablinskiy "participated in the excessive force when he

15   stomp[]ed and kicked Plaintiff's back and left side of rib area . . . , [t]hen crossed over Plaintiff's

16   body while lying face down handcuffed . . . [and] went to his knees, grabbed two hand[]ful[]  of

17   hair and began to slam Plaintiff's face into the ground while yelling racial epithets."  Dkt. 69 at 10.

18        Plaintiff has created a genuine issue of material fact as to whether Defendant Shablinskiy

19   was involved in the use of unconstitutionally excessive force in striking a subdued suspect

20   multiple times.  *See Drummond*, 343 F.3d at 1058-60.  Because the Court construes Plaintiff's

21   allegations to mean that Defendant Shablinskiy participated in the use of force and was present

22   while the Primary Defendants engaged in their use of force, Plaintiff has also created a genuine

23   issue of material fact as to whether Defendant Shablinskiy had an opportunity to intervene to

24   prevent the use excessive force against Plaintiff by the Primary Defendants.  *See Koon*, 34 F.3d at

25   1447 n.25.

26        Therefore, the Court finds that Defendant Shablinskiy is not entitled to summary judgment

27   on the excessive force claim as a matter of law.

28

### 4.  Summary

In sum, Plaintiff's verified allegations that he was lying face down on the ground show that he was effectively under police control and no longer a danger when the officers used force against him.   Therefore, Plaintiff has created a genuine issue of material fact as to whether those officers (the four Primary Defendants and six of the Secondary Defendants) were involved in the use of unconstitutionally excessive force in striking a subdued suspect multiple times.  Plaintiff has also created a genuine issue of material fact that all eight of the Secondary Defendants had an opportunity to intervene to prevent the use excessive force against Plaintiff by other officers. Therefore, Defendants are not entitled to summary judgment on the merits of the Fourth Amendment claim.

### C.    Qualified Immunity

Having concluded that genuine issues of material fact exist as to whether the Primary and Secondary Defendants used excessive force against Plaintiff or failed to intervene to prevent such use of force in violation of the Fourth Amendment, the Court next addresses whether these Defendants are entitled to qualified immunity.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Regarding the first prong, the threshold question must be, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The inquiry of whether a constitutional right was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition.  *Id.* at 202.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was

1    unlawful in the situation he confronted.  *Id.*  Although *Saucier* required courts to address the

2    questions in the particular sequence set out above, courts now have the discretion to decide which

3    prong to address first, in light of the particular circumstances of each case.  *See Pearson v.*

4    *Callahan*, 555 U.S. 223, 232 (2009).

5            The Court finds granting summary judgment on the ground of qualified immunity is

6    improper in this case.  Here, Defendants do not argue that the constitutional rights at issue were

7    not clearly established during Plaintiff's arrest in 2012, and, specifically, the Court finds that

8    Plaintiff's right to be free from the use of excessive force at arrest—specifically, the use of

9    unconstitutionally excessive force in striking a subdued suspect multiple times—was clearly

10   established at that time.  *See Drummond,* 343 F.3d at 1061-61 (using police department training

11   bulletin warning officers that kneeling on a subject's back or neck could result in compression

12   asphyxia and death as evidence that the force used was unreasonable and that a reasonable officer

13   would have known it); *Blankenhorn*, 485 F.3d at 481 (law was clearly established at time of

14   defendant's arrest giving arresting officers sufficiently fair notice that their conduct in punching,

15   gang tackling, and using hobble restraints to take defendant into custody could have been

16   unconstitutional); *Winterrowd v. Nelson*, 480 F.3d 1181, 1186 (9th Cir. 2007) (As of July 10,

17   1998, "[n]o reasonable officer would believe he could constitutionally force a harmless motorist

18   against the hood of a car and cause him unnecessary pain.").  Granting summary judgment on the

19   ground of qualified immunity is "improper if, under the plaintiff's version of the facts, and in light

20   of the clearly established law, a reasonable officer could not have believed his conduct was

21   lawful." *Schwenk v. Hartford*, 204 F.3d 1187, 1196 (9th Cir. 2000).

22           Here, under Plaintiff's version of the facts, no reasonable officer could believe that the

23   Primary and Secondary Defendants' actions were permitted under the Fourth Amendment.  In

24   addition, where, as here, "the material, historical facts are in dispute," the availability of qualified

25   immunity does not turn solely on a question of law, and the district court is precluded from

26   granting summary judgment on qualified immunity grounds.  *See Torres v. City of Los Angeles*,

27   548 F.3d 1197, 1211 (9th Cir. 2008) (holding that the existence of issues of material fact precludes

28   a court from granting judgment as a matter of law on qualified immunity grounds, and observing

United States District Court
Northern District of California

22

1    that "sending factual issues to the jury but reserving to the judge the ultimate 'reasonable officer'

2    determination leads to serious logistical difficulties").

3        In sum, accepting Plaintiff's allegations as true, there are genuine issues of fact as to

4    whether the Primary and Secondary Defendants violated Plaintiff's constitutional rights.

5    Accordingly, they are not entitled to summary judgment on the merits or based on qualified

6    immunity.  Therefore, Defendants' motion for summary judgment is DENIED.

7                        **PLAINTIFF'S PENDING MOTION**

8        On September 21, 2015, Plaintiff filed a motion entitled, "Motion for Judicial Assistance

9    to Subpoena Discovery Documents." Dkt. 67.  In that motion, Plaintiff points out that Defendants

10   produced a copy of the CAD Transcript from the police radio traffic during the May 24, 2012

11   pursuit and eventual arrest of Plaintiff, but that it includes "18 redacted lines of information that

12   could possibly incriminate the officers." *Id.* at 2.  Plaintiff asks the Court to "intervene and

13   subpoena the documents from the Department of Emergency Management [of the] City and

14   County of San Francisco ["DEM"] . . . [a]nd have the documents unredacted directly to the

15   plaintiff." *Id.* at 2-3.

16       Meanwhile, Defendants have responded to Plaintiff's motion stating as follows:

17           Certain portions of the transcript are redacted because it shows
             CLETS information. CLETS stands for California Law Enforcement
18           Telecommunications System, and it can include a person's criminal
             history, warrants, restraining orders, victim information, sex
19           offender registrations, DMV information, gang affiliation, or other
             identifying information such as tattoos or scars.  California Penal
20           Code § 1142 makes it a misdemeanor to produce CLETS
             information to non-law enforcement.
21

22   Dkt. 68 at 2.  Defendants have also attached a declaration from the DEM's custodian of records,

23   Suzanne Borg, attesting that all the redacted portions of the CAD are CLETS information.  *Id.*;

24   Dkt. 68-1 at 2-3.  Defendants argue that because Plaintiff has "not put forth competent evidence to

25   dispute this declaration, the Court should deny any request for assistance." Dkt. 68 at 1.

26       At this time, the Court notes that since Plaintiff filed the aforementioned motion, he has

27   filed his opposition to Defendants' motion for summary judgment. Dkt. 93.  Further, Plaintiff has

28   neither expressed difficulty filing his opposition due to the redacted portions of the CAD transcript

United States District Court
Northern District of California

United States District Court
Northern District of California

1  nor indicated that he had insufficient opportunity to discover affirmative evidence necessary to

2  oppose Defendants' motion.  Moreover, the Court need not construe his motion as a request for a

3  continuance under Rule 56(d) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 56(d)

4  (Rule 56(d) provides that a court may deny a summary judgment motion and permit the opposing

5  party to conduct discovery where it appears that the opposing party, in the absence of such

6  discovery, is unable to present facts essential to opposing the motion.).  Therefore, at this time, the

7  Court will resolve the pending motion for summary judgment even though this discovery dispute

8  exists.

9       Because this case may proceed to trial if settlement proceedings are unsuccessful, the

10  Court GRANTS in part Plaintiff's motion to the extent that it finds that an in camera review of the

11  CAD transcript is warranted to verify the basis for Defendants' redaction.  If confirmed that the

12  redacted portions of the CAD transcript are "CLETS information," then an unredacted version will

13  not issue.  Therefore, until the Court reviews the unredacted version, it DENIES in part Plaintiff's

14  motion to the extent that he seeks an order to subpoena a copy of the unredacted version.

15       Accordingly, the Court GRANTS in part and DENIES in part Plaintiff's "Motion for

16  Judicial Assistance to Subpoena Discovery Documents."  Dkt. 67.  The Court directs Defendant to

17  provide it with a copy of the unredacted CAD transcript.  Said document shall be filed under seal

18  and not available for inspection by the public or Plaintiff absent a court order permitting such

19  inspection, as directed below.

20                                              **CONCLUSION**

21       For the reasons outlined above, the Court orders as follows:

22       1.       Defendants' motion for summary judgment is DENIED.  Dkt. 59.

23       2.       Plaintiff's "Motion for Judicial Assistance to Subpoena Discovery Documents" is

24  GRANTED in part and DENIED in part.   Dkt. 67.  No later than **March 14, 2016**, Defense

25  counsel must e-file the unredacted CAD transcript under seal in accordance with the instructions

26  in Northern District Civil Local Rule 79-5.

27       3.       The Northern District of California has established a Pro Se Prisoner Settlement

28  Program.  Certain prisoner civil rights cases may be referred to a Magistrate Judge for a settlement

24

conference.  The Court finds that a referral is in order as to Plaintiff's Fourth Amendment claim. Thus, this case is REFERRED to Magistrate Judge Nandor Vadas for a settlement conference. The conference shall take place within sixty (60) days of the date of this Order, or as soon thereafter as is convenient to the Magistrate Judge's calendar.  Magistrate Judge Vadas shall coordinate a time and date for the conference with all interested parties and/or their representatives and, within ten (10) days after the conclusion of the conference, file with the Court a report of the result of the conference.  The Clerk of the Court shall provide a copy of this Order to Magistrate Judge Vadas.

4.       If this matter does not settle, then this case will proceed to trial.

5.       Pursuant to Fed. R. Civ. P. 16(b) and Civil L. R. 16-10, a Case Management Conference shall be held in this case on **Monday, June 6, 2016, at 2:00 p.m.**, at the United States District Court for the Northern District of California, Ronald V. Dellums Federal Building, Oakland in Courtroom 1, 4th Floor.  Because Plaintiff is incarcerated, he may appear telephonically.

Each party must file and serve a case management statement no later than **seven (7) calendar days** prior to the Case Management Conference, indicating what discovery remains to be done, the amount of time needed for discovery, whether any further motions will be filed, when they will be ready for trial, and an estimate of the number of days needed for trial.  The case management conference statements need not be jointly prepared.

The Deputy Attorney General representing Defendants in this action will be responsible for making sure Plaintiff appears telephonically.  The Deputy Attorney General should call the courtroom deputy in advance to obtain the phone number.

As set forth in the Court's Standing Order in Civil Cases, these conferences are intended to be substantive and productive.  Accordingly, each party shall be present at the Case Management Conference with authority to enter into stipulations and make admissions pursuant to Fed. R. Civ. P. 16(a) and (c), as well as fully prepared to address all of the matters referred to in the CAND CMC Order and Civil L.R. 16-10(b).

Failure to do so shall be considered grounds for sanctions.

United States District Court
Northern District of California

1          6.       This Order terminates Docket Nos. 59 and 67.

2          IT IS SO ORDERED.

3   Dated: February 29, 2016

    _____
    YVONNE GONZALEZ ROGERS
    United States District Judge